CARMEN REGINO BORGES, Appellant, *v.* THE REGISTRAR OF PROPERTY OF GUAYAMA, Respondent.

No. G-64-2. Decided October 28, 1964.

108

 

*José J. Rivera Inchausty* for appellant. The Registrar appeared by brief.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

I

Appellant is in the following situation: the State, through a public office, requires him to do a certain thing, and through another forbids him to do it. He has resorted to us as arbitrators of the public administrative system in order that we may decide his dilemma. The aforesaid two public offices are the Planning Board and the Registry of Property. The problem comes to us as an apparent conflict between two legal provisions: a regulation adopted under authority of law and another law.

██ We advance what follows. If what appellant wishes to do is not prohibited by law, nor in contravention of morals or public order, he can do it. Section 1207 of the Civil Code, 31 L.P.R.A. § 3372; *Castle Enterprises, Inc.* v. *Registrar*, 87 P.R.R. 738 (1963). Naturally, if what appellant wishes to do is prohibited, and if the prohibition is constitutionally valid, he cannot do it. If it is true that a legal provision (a Planning regulation adopted under legal authority) orders it and another (a section of the Civil Code) prohibits it, the conflict would be between two internal legal provisions, and in that case we would decide the conflict in the most realistic manner giving effect to, or creating, the most socially useful norm.

Petitioner and his wife executed a public deed whereby they segregated four lots from a property owned by them. The lots segregated were identified in the deed as follows: Lot No. 1 of 1067.50 square meters, Lot No. 2 of 1225 square meters, Lot No. 3 of 900 square meters, and Lot No. 4 of 719.25 square meters. After those segregations there remained 6.5532 cuerdas. In approving the segregation, the Planning Board of Puerto Rico in its "Dispensation of Conditional Rural Subdivision" made the following determination:

"In view of the fact that the remainder has no legal access to a public highway, it is a *sine qua non* condition for the registration of this subdivision that a right-of-way 10 meters wide be established by public deed."

In compliance with the obligation imposed, petitioner, in putting in a public deed the said segregation—as he is bound to do—executed a deed of segregation and establishment of a right-of-way through lots Nos. 3 and 4 in favor of the remaining tenement, which is enclosed. The dominant tenement and the two servient tenements are described in detail in the deed. It is set forth therein that "the servitude is established because it has been required by the Planning Board of Puerto Rico as a condition *sine qua non* for the registration of the subdivision, and because it is convenient for the improvement of the tenements and the public order, in addition to other good and valuable causes."

Upon presentation of the deed in the Registry of Property of Puerto Rico, Guayama Section,[1] the registrar returned the same unrecorded with a note which reads as follows:

"The present document is returned, after examining the two complementary documents of the Planning Board which are enclosed, without performing the operations sought on the ground that the segregation of the four lots for the purpose

---

[1]For the present organization of the Registry of Property, see Act No. 3 of September 2, 1955, 30 L.P.R.A. § 1748 *et seq.*

of recording them in the name of the owners, Carmen Regino Borges and Aida Bonilla, is subject to the condition imposed by the Planning Board that a right-of-way be established on those tenements in favor of the remainder of the main property in order that it may have access to a public highway, which condition cannot be met since no one may establish a right-of-way on his own tenement, pursuant to the provisions of § 465 of the Civil Code in force, whenever both tenements, dominant and servient, belong to the same owner."

The registrar's position, presented in a written memorandum with exemplary circumspection, discretion, and propriety, consists essentially, and as indicated by the note copied above, in that § 465 of the Civil Code, 31 L.P.R.A. § 1631, precludes the registration sought. That section reads as follows verbatim:

"A servitude is a charge imposed upon an immovable for the benefit of another tenement belonging to a different owner.

"The immovable in favor of which the servitude is established is called the dominant tenement; the one subject thereto is called the servient tenement."

The registrar is of the opinion that in order to do what appellant wishes to do, it would be necessary to amend § 465 *supra* of the Civil Code so as to permit the owner's servitudes, that is, the servitudes on one's own tenements for the benefit of another tenement also owned by him. Citing from *Colón* v. *San Patricio Corporation*, 81 P.R.R. 236 (1959), the registrar reminds us that § 733 of the Civil Code of Switzerland permits the owners to establish servitudes on their tenement in favor of another real property also owned by them. He recognizes, it seems, that the rules *servitus in faciendo consistere nequit* and *nomini res sua servit* are at present tottering. If those rules are substituted or modified, he admits, "it would not be the first time that the individualistic principles of Roman legislation would have to yield to the law of the future." The registrar is further of the opinion that "in view of the development of our urbani-

zations . . . it is likely that it may so occur, and *it is even desirable and acceptable that it be so done,* incorporating into our positive law the necessary amendments which may be more practical to the so far increasing development of our urbanizations." (Italics ours.)

The registrar believes, however, that it is better that those changes be made through legislation and not through judicial construction. To that end he says:

"We say the foregoing without losing sight of the fact that it is true that the courts are the ones called upon to apply the baptismal water to the newly created juridical concepts subject to the doctrine condensed in the rule of *'nemerus apertus,'* but in order to prevent present hesitations of the registrars of property who pass upon the documents with unequal criterion, and also of the case law in the light of the new concepts devised by the inventiveness in contracting, it is by far better that the legislative bodies intervene directly by fixing the patterns in the positive law."

Appellant's position: In a realistic and sociologically minded brief, appellant argues that the Planning Board, an agency created by law for the purpose of establishing the public policy in matter of planning, requires in this case the establishment of the aforementioned right-of-way as a condition for permitting the segregation of the four lots in question. This condition, he says, has the force of law, was fulfilled by petitioner, and the same is of public interest.

It is about time, says appellant, that it be admitted in our law that a predial servitude can be created in favor of one's own tenement, since the rule to the contrary is at present inconvenient. He argues that the old Roman legislation must yield to our present-day law. He maintains that § 465 *supra* of the Civil Code does not prohibit the creation of other juridical concepts different from the servitudes therein mentioned. He cites § 2 of the Mortgage Law and § 27 of the Mortgage Law Regulations whereby all real

rights are recordable, without limiting their number to those mentioned in the Civil Code.

In the alternative, appellant argues, the condition imposed by the Planning Board is a legal servitude imposed by law and is therefore recordable. Also in the alternative he argues that the right-of-way under consideration is not an invalid act, but at the most it remains and shall become effective when the different lots affected pass into the hands of other owners, and that the registration entries requested should therefore be made.

Appellant concludes by stating the following:

"The needs of our urban and rural development, regulated by the State to guarantee the common good, require the incorporation into our law of new juridical concepts and variations of those already established and organized by our Civil Code, since this is not in contravention of law but conforms its provisions to the new realities of modern life by the interpretation of the spirit of the laws which should be so flexible as to conform to the needs of our times. The Civil Code is not a body of inflexible, rigid and narrow laws, but, on the contrary, it admits of interpretation to serve countries where it is in force in accordance with the live realities of the times, otherwise many of its provisions would become dead letter instead of being vitalized by the wisdom of the courts in their huge interpretative task which becomes our case law."

## II

This is not a case of restrictive clauses, known in Anglo-Saxon law as "equitable servitudes," covenanted by the urbanizers of a parcel within a general plan of improvements for the development of a residential urbanization, as was the case of *Colón* v. *San Patricio Corp.*, *supra*. There we said at p. 244 that within the Civil Code system it is very difficult to use the juridical concept of predial servitude for the purpose of *private* restrictions upon lands sought to be urbanized, and once again we resorted to the concept of "equitable

servitude" in order to legalize within our civil law an acknowledged desirable system for urbanizing and improving tenements. We referred to the system or practice of covenanting restrictive clauses the purpose of which is to create a pleasant, aesthetical and wholesome residential neighborhood.[2]

Already since *Glinés* v. *Matta*, 19 P.R.R. 388 (1913), we had incorporated into our law the concept of equitable servitude, a step which we have confirmed time and again.[3]

In *Colón* v. *San Patricio Corporation, supra*, we said at p. 245 the following:

"The practical needs created by recent urbanization developments have given rise to severe criticism of the rules of *'nemini res sua servit'* and *'servitus in faciendo consistere nequit'* in many civil-law countries such as Germany, Belgium, and Switzerland. [Citations omitted.] Enneccerus, Kipp & Wolff admit that 'there are many reasons in favor of the necessity of the owner's servitude,' precisely in the case of urbanization burdens. [Citations omitted.] The Belgian doctrine and case law have also struggled against the existing juridical obstacles to create truly positive servitudes and to impose urbanization burdens on a single tenement. De Page says that the practical interests require that such urbanization burdens constitute servitudes of a real character, and analyzes the means employed for eluding in practice the inflexibility of the law. He concludes that: 'The

---

[2] On equitable servitudes, see Clark, *"Covenants and Other Interests Which 'Run With the Land'"* 174–77 (2d ed. 1947); Maitland, *Equity* 162–67 (2d ed. 1936); Stone, *"The Equitable Rights and Liabilities of Strangers to a Contract,"* 18 Colum. L. Rev. 291, 19 *id.* 177 (1918); Ames, *"Specific Performance Against Strangers to the Contract,"* 17 Harv. L. Rev. 174 (1903), also in *id., "Lectures on Legal History"* 381 (1913); Pound, *"Progress of the Law-Equity,"* 33 Harv. L. Rev. 813–22 (1919); *In re Nisbet and Potts' Contract*, 1 Ch. 391 (1905), 1 Ch. 386 (1906); Chafee, *"Equitable Servitudes on Chattels,"* 41 Harv. L. Rev. 945 (1928).

[3] *Lawton* v. *Rodríguez*, 35 P.R.R. 445 (1926); *Macatee* v. *Biascoechea*, 37 P.R.R. 1 (1927); *Carrión* v. *Lawton*, 44 P.R.R. 448 (1933); *Fiol* v. *López de la Rosa*, 46 P.R.R. 724 (1934); *Santaella* v. *Purón*, 60 P.R.R. 539 (1942); *Baldrich* v. *Registrar*, 77 P.R.R. 700 (1954); *Pérez* v. *Pagán*, 79 P.R.R. 185 (1956); *Colón* v. *San Patricio Corporation*, 81 P.R.R. 236 (1959).

rule *servitus in faciendo consistere nequit* . . . is staggering at present. The day will perhaps come when it will be admitted that a servitude consists in doing something positive, provided it involves an act of public interest. It would not be the first time that the individualistic principles of the Roman legislation would have to give in to the law of the future.' [Citations omitted.] And the Civil Code of Switzerland in its § 733 authorizes every owner to establish a servitude on a tenement belonging to him in favor of other real property also belonging to him. The 'Statement of Motives' contains the following justification: 'This institution may be very useful. It is enough to think about the construction of a whole urbanization on certain property which originally belonged to a single owner. *The latter may create from the beginning,* on all the lots to be sold thereafter, *appropriate servitudes for the entire urbanization project.*' " (Citations omitted.) (Italics ours.)

Those are good reasons for making flexible and for revitalizing, in the last third of the 20th Century, a Civil Code drafted in the latter third of the 19th Century. As stated by Ihering in his famous *Spirit of the Roman Law,* the adoption of extraneous juridical institutions is a question of necessity rather than of nationality. However, we need not carry the note to the limit.

It is not necessary in the case at bar to take from the Anglo-Saxon law any juridical concept or institution because the Civil Code—which after all is a masterpiece—contains in its own body the exact and precise provisions governing the situation presented in this case.

■ ■ Before proceeding further, and although we are not going to base this opinion on the aforesaid § 465 of the Civil Code (counterpart of the Spanish § 530), let us make clear once and for all the situation by pointing out that the terms apparently absolute of that section are not absolute. Let us illustrate it. Said § 465 says, as we already noted, that a servitude is a charge imposed upon an immovable for the benefit of another tenement. If the servitudes cov-

ered by Title VII, Book II, of the Civil Code, were only those, that is, servitudes imposed on a certain real property for the benefit of another real property, it would not be possible, within the Civil Code system, to establish servitudes upon real property for the benefit of a person. Yet, this is possible. It is possible because, despite what § 465 says, the Code itself provides in § 466 that servitudes may also be established for the benefit of one or more persons.

Scaevola criticizes that contradiction between those two sections,[4] but recognizes, as do other textwriters, the historical origin of § 466 (equivalent to the Spanish § 531). The Spanish civil-law authorities explain that that section is not of Spanish national origin, but that it came into the Spanish Code through the French Code of 1804. The servitudes referred to in § 466 are the personal servitudes (known as such in Roman law), which were not so called when they were codified at the time the French Civil Code was drafted. The term "personal servitudes" seemed inadmissible to the lawmakers of the French Revolution because it reminded them of former ominous times, and hence the drafting of that section.[5] The influence of the French Code of 1804 on the subsequent civil codes is known. Many countries patterned their codifications after the French Code, reproducing its spirit and directive lines.[6] It is perhaps for this reason that the Supreme Court of Spain has considered the personal servitudes irregular or anomalous, and has pointed out that since the Spanish Civil Code does not con-

---

[4] 10 *Código Civil* 80 (1895).

[5] III–1 Puig Peña, *Derecho Civil* 378; Scaevola, *op. cit.* at 143; I De Diego, *Instituciones del Derecho Civil Español* 467 (1959).

[6] This was the situation, for example, in Holland, Italy, Romania, Portugal, Spain, Switzerland, Egypt, Louisiana, and in practically all countries of South and Central America. I–1 Castán, *Derecho Civil Español, Común y Foral* 150 (9th ed. 1955); Scaevola, *op. cit.* at 143; I Valverde, *Tratado de Derecho Civil Español* 59 (4th ed.).

tain norms on those servitudes, they must be governed by the title of their establishment.[7]

■ The thought about all of this is considerably clarified if we bear in mind that § 465 refers to typical servitudes, and that other sections of the Code, such as § 466, refer to atypical servitudes. Legal servitudes are also servitudes of a special nature.[8] Roca Juan terms them "jus singulare."[9] It may be asserted, writes Valverde, that "legal servitudes, in the extent and concept in which they are conceived at present, were not known in Roman Law."[10] Using a traditional or strict criterion, it may be said that properly speaking they do not constitute true servitudes.[11] That is why in the case of legal servitudes we cannot apply *grosso modo* the doctrine and criteria elaborated on traditional servitudes of Roman origin. Further on we point out that the text-writers explain that the legal servitude system comes within the ambit of administrative law.

The Civil Code establishes the predial servitudes in § 465, the personal servitudes in §§ 466 and 467, and so on it speaks of continuous and discontinuous servitudes, apparent and not apparent, etc., in §§ 467 to 469, 31 L.P.R.A. §§ 1631–35. In § 472, which is the last of that subchapter, entitled "Kinds of Servitudes," the Code says that "Servitudes are established either by law or by the will of the owners. The former are called legal servitudes and the latter

---

[7] Judgments of May 3, 1906, July 5, 1918, April 4, 1921, and December 18, 1933, of the Supreme Court of Spain, cited in Roca Juan, *Las Servidumbres*, § 531, p. 1.

[8] IV Manresa, *Comentarios al Código Civil Español* 731 *et seq.* (6th ed. 1951).

[9] *Las Servidumbres*, tit. VII, ch. II, p. 2 (1961).

[10] II *Tratado de Derecho Civil Español* 364 (4th ed.).

[11] It is so stated, for example, by Professor Guaroa Velázquez. See his lectures on *Los Derechos Reales Principales*, p. 224 (1937), mimeographed, University of Puerto Rico. See, also, III Puig Brutau, *Fundamentos de Derecho Civil* 392–93 (1953); III Sánchez Román, *Estudios de Derecho Civil* 610–11 (2d ed. 1900); and II Valverde, *op. cit.* at 364.

voluntary servitudes." 31 L.P.R.A. § 1638. Further on and in another chapter the Code again refers to legal servitudes, and there it contains the following three provisions in its brief section on "General Provisions" on legal servitudes (31 L.P.R.A. §§ 1701–03):

"The object of servitudes imposed by law is either public utility, or private interest." Section 485.

"All that concerns servitudes established for public or common utility, shall be governed by the special laws and regulations relating thereto, and in the absence of such, by the provisions of this part." Section 486.

"The servitudes established by law for the interest of private persons or from motives of private utility, shall be governed by the provisions of this part, without prejudice to the provisions of general or local laws, regulations and ordinances with regard to city or rural police.

"These servitudes may be modified by agreement among the persons interested if the law does not prohibit it, and if it be not prejudicial to a third person." Section 487.

It is self-evident that in matters of legal servitudes established for public utility the Civil Code is supplementary (§ 486), and that as respects the legal servitudes established for the interest of private persons, the provisions thereof shall govern *without prejudice to the provisions of special laws and regulations* (§ 487). In commenting on the Spanish § 550, counterpart of our § 486, Manresa says:

"The application of the positive law to servitudes of this type must be made if the *special laws and regulations* have in each particular servitude *the character of principal right* or first degree, *and the present title of the Code that of supplementary law*." IV *Comentarios al Código Civil Español* 736 (6th ed. 1951). (Italics ours.)

In his commentaries on legal servitudes, Borrell y Soler states it as follows:

"Hence, in the case of servitudes for the public interest the proper law is the administrative law and the supplementary

law is the Civil Code, and in the case of those for private interest the proper law is the Code, without prejudice, however, to the administrative provisions on urban or rural police. *Therefore, the administrative provisions have preference in both cases.*" II *Derecho Civil Español* 476 (1955). (Italics ours.)

The same view is held by Puig Brutau in III *Fundamentos de Derecho Civil* 419 (1953) and by Scaevola, *op. cit.* at 362.

The distinction made by the Code between legal servitudes established for the public interest and those established for the benefit of private persons is somewhat artificious and we cannot take it too literally. Some textwriters point it out. Borrell y Soler says that it is not always easy to distinguish whether a servitude is of public or private utility, because the interest of private persons may transcend to the public.[12] Although it is true that the public interest is clearer in some than in others, both types of servitudes are established by law because it is convenient for the public order that there be positive law on the matter. Manresa comments on it as follows:

"In the first place, nothing is as vague and indefinite as the aprioristic distinction between public and private; the same case law is not always clear in fixing distinctively the public or private character of disputes on servitudes. On the other hand, a distinguished commentator of the Italian Civil Code, Mr. Ricci, in explaining the general concept of legal servitudes, warns that 'even though these refer to private utility, yet, they are always established for reasons of general interest, since the lawmaker has experienced the need for limiting and ordaining the liberty of private persons, precisely for the purpose of guaranteeing common liberty and thus reconcile conflicting rights and interests.' "[13]

Further on, at the same page *supra*, Manresa, referring to the Civil Code system of legal servitudes, points out that

---

[12] II Borrell y Soler, *op. cit.* at 476.

[13] IV Manresa, *op. cit.* at 733.

"their character is actually public, general, of the interest which requires their orderly system." The private law, although apparently it deals with the interest of private persons, exists because experience has shown that it is desirable for community life and for the peace in general that the matters comprised therein be regulated in advance by coercive norms. Laws produce the orderly liberty which is the only real and possible liberty in human society, since the contrary, the absolute liberty of every human being, would result in anarchy and in the negation of liberty itself of each person.

We have therefore seen that legal servitudes are governed by their special laws. In the case of public servitudes, the Code is supplementary law, and in the case of the so-called private servitudes, the Code governs but only insofar as that legal body is not in conflict with the special laws and regulations on the matter. Those special laws and regulations have priority. Even the so-called private legal servitudes bear close relation to the public order. Having examined the civil-law provisions on legal servitudes, we must now examine the administrative law on the matter, which law, as we have seen, has preference on this matter over the Code.

The Puerto Rico Planning and Budget Act, No. 213 of May 12, 1942, as amended, 23 L.P.R.A. § 1 *et seq.*, provides in § 3 that the powers therein granted shall be exercised for the general purpose of guiding a coordinated, adjusted and economic development. Section 9 of that Act authorizes the Board to adopt regulations on zoning and other matters. Such regulations shall apply to urban areas, or areas to be urbanized, and also to farm areas and to beaches, in the circumstances determined by the Act. More specifically, § 10 orders the Board to adopt regulations to govern the subdivision of lands in Puerto Rico. Such regu-

lations may require that land be reserved for public purposes. *Seashore Realty & Invest. Co.* v. *Planning Board*, 75 P.R.R. 134, 142 (1953); *Zayas* v. *Planning Board*, 69 P.R.R. 27, 33–34 (1948). It shall be the duty of the Board to consider, in connection with land subdivision, adequate social and physical facilities. 23 L.P.R.A. § 10. We have no doubt that a road providing access to lands which, as a result of a subdivision, would otherwise remain enclosed, is a necessary physical facility and of private and public interest. If the Board has power, as it does, to require that lands be set aside for streets and public roads, it also has power to require servitudes for the same purpose. He who does that which is more does that which is less. Lastly, in order to provide sanction to the provisions of the Act and of the regulations on this matter, which may be adopted under the authority thereof, the Act provides in § 24 that no subdivision of land shall be made and no plat of subdivision of land which does not comply with the regulations and has not been approved by the Board shall be received for recording. The same section provides, *in fine*, that "The execution of any public deed or any private contract regarding subdivision shall be ineffectual if such subdivision has not previously been submitted for the consideration of the Puerto Rico Planning Board and been approved by the said Board, except in cases in which the Subdivision Regulations permit such subdivision." 23 L.P.R.A. § 25.

In the discharge of its statutory responsibilities the Board has adopted regulations. It has provided therein that:

"Every subdivision shall be made in such a way that each lot or plot has satisfactory access to an existing highway, avenue or public street or the construction of which is planned within the land subdivision project." 23 R.&R.P.R. § 10–154 (a).

It has also provided that "Easements shall be required . . . along the boundaries or across the lots when necessary

for the extension of existing or planned services." 23 R.&R. P.R. § 10–305 (b).

The necessity and convenience of the objectives of the aforesaid sections is clear. Practically all civilized societies have adopted planning and urbanization measures. Those measures mean, unquestionably, limitations on property right, but they produce better communities for peaceful human living, and even from the merely economic point of view they enhance the value of real property therein situated by improving the towns and places where such measures are put in practice.

In his excellent article, *"En Torno al Urbanismo, Política del Suelo y Registro de la Propiedad,"* 39 *Revista Crítica de Derecho Inmobiliario* 443 (1963), Fuentes Sánchez points out that the complex of problems raised by the unusual expansion of urban centers is universal. He cites vital statistics to show that by the year 2000, 45 percent of the inhabitants of the globe will live in cities. He indicates that the legislative coincidences in the different countries on planning, condemnation, designation of green zones, etc., are not the product of chance nor mere mimetism.[14] Dealing with the problems of public or administrative intervention inevitably brought about by those changes, Fuentes Sánchez says at p. 452:

"We have sufficient experience in our real property registration technique; but, are we sure that it will satisfy us, without adjustments, and be able to cope with future problems? Unquestionably it does not seem so, and we should prepare ourselves in order that, without solutions of continuity, new formulas be found."

At the end of his article this textwriter, who is a registrar of property in his country, asserts:

---

[14] For example, the Spanish modern legislation on urbanization is abundant and elaborate.

"The structure of the Registry of Property should only be rigid in its fundamental principles, but in its operation it must conform to the situations and circumstances. Jurists have, in the Policy of the Soil, a noble task: to serve once more to the development of the community."

It is idle to insist on this, but since it has a certain interest, because of its source, we shall reproduce a page from Scaevola, published in 1895. The distinguished civil-law commentator in writing on legal servitudes says:

"In view of the structure of property right in our times, the owner may enjoy and dispose freely of the thing; but this freedom must be subordinated to the restrictions which the law, representing the public or private interest, establishes in favor of those very interests. Absolute individual property is impossible; man, in living in community, must submit to the conditions imposed by the representative agencies of the former to regulate the relations of the individuals in the various human orders which cannot be left because of their nature to personal free determination.

"This occurs par excellence in the economic order; it governs and controls the others, because the accomplishment of any human purpose necessarily requires economic or material means, and hence the perfect right of society or of its agencies to intervene in the ownership relations in order that all men may normally enjoy the property within the form which it now presents. Absolute economic freedom is an economic absolutism because, like the political absolutism, a person is owner, without limitation, of a thing (as was the King of the Nation), to the detriment of the right of others."[15]

■ It was in compliance with the aforecited provisions of the Planning Act and of its Subdivision Regulation that the Board required appellant to establish by public deed a servitude of right-of-way 10 meters wide across lots Nos. 3 and 4, since otherwise the remaining tenement would have been enclosed. The registrar objected to the registration of that servitude. As already stated, his position is based on

---

[15] *Op. cit.* at 357.

the strict application of § 465 of the Civil Code. If it were a typical servitude, namely, a voluntary right-of-way, the registrar would be correct in the light of that section. But, as we have seen, it is a so-called legal servitude, which is but a limitation of the property right imposed by the State for the public interest. It is therefore a compulsory limitation on the property right—the new Italian Civil Code, § 1032, calls them "coercive servitudes"— and the problem comes within the ambit of public or administrative law, as we have pointed out and was also pointed out by the text-writers.

The reason for the difference between those two cases (the voluntary servitude and the legal servitude) is that there would be no reason why a property owner should wish to establish a right-of-way on his own tenement, since it is evident that he could pass through his own land as many times as he wished. That is why the Code does not allow margin, within the terms of § 465, for a property owner to impose a servitude on his own tenement. In this case, however, the land has been subdivided and a number of lots have been segregated, evidently for the purpose of alienating them. It is known that subdivisions and segregations are not made for the sheer pleasure of making them. That is why the public right may interfere by requiring that those lots and tenements which will eventually pass to different hands have access to a public thoroughfare. Otherwise many surrounded lots and tenements would be sold in Puerto Rico, giving rise to a multiplicity of suits. *Cf.* § 500 of the Civil Code.

We wish to say, in justice, that the registrar's position is neither rash nor absurd, but that we believe that it is not the best interpretation nor one which would create the best Law for this type of situations. The weakness of the registrar's position is that he attempted to apply to this situation —a legal servitude established by positive administrative law—the criteria and the doctrine of Roman origin respect-

ing traditional servitudes. We have already seen why this is erroneous. As pointed out by Valverde in writing on the tendencies of modern civil doctrine and on the influx of many problems arising from civil legislation, "it is plain that the present civil law should not be a Romanized law, but a socialized law, so that it may fully meet the needs which it will regulate at present and in the future.[16] The Chief Justice of the Supreme Court of Spain, José Castán Tobeñas, shares the same view.[17]

█ We agree with the registrar that it would be better if the matter were expressly clarified by legislative action for the benefit of all registrars. The legislative bodies are the ones which comprehend, or should comprehend, the aspirations and needs of the society which they represent, and it is up to them to engineer them into public policy and concrete norms to become our laws; but it is necessary to bear in mind that in view of the need for reforms in our civil law which may take decades or may not come by legislative fiat, we cannot permit our Civil Code to become a wreck for lack of creative judicial construction.[18]

█ However, we are not doing violence to the provisions of the Civil Code, nor are we forcing judicial construction. We are acting within the directives of the Code itself because, as we have seen, the Code provides that in matter of legal servitudes the statutes, first, and then the special regulations, shall govern. It is natural for the Code to so provide because such legal servitudes are established by law for the public interest, and they constitute public

---

[16] I *Tratado de Derecho Civil Español* viii (4th ed.).

[17] I-I *Derecho Civil Español, Común y Foral* 158 (10th ed.); p. 149 in the 9th ed.

[18] In order to illustrate how difficult it is to accomplish systematic reforms of the Civil Code, see what Castán writes to that effect in I-I Castán, *Derecho Civil Español, Común y Foral* 194 (10th ed.); p. 185 in the 9th ed.

and administrative law rather than civil law properly speaking. That is why Valverde writes:

"Many are the public legal servitudes to be governed by special provisions, and in default thereof by the Civil Code; but the study of such servitudes rather corresponds to administrative law, and for that reason we do not take them into consideration." II *op. cit.* at 369.

And Planiol and Ripert state:

"There are many legal servitudes of public interest. Almost all of them grow out of administrative laws. We shall confine ourselves to the mere enumeration of such servitudes. A thorough study would have too many points of contact with the public law." *Tratado Práctico de Derecho Civil Francés*, Spanish translation by Díaz Cruz (1942), vol. 3, p. 752.

Borrell y Soler also says that legal servitudes of public interest are governed, first, by the administrative law rather than by the Civil Code.[19] De Diego shares the same view.[20]

■■ The legal servitude herein imposed being a real right, because it is an encumbrance on real property and limits the ownership right thereto, it is recordable because § 2 of the Mortgage Law, 30 L.P.R.A. § 2, and § 27 of the Regulations thereof, 30 L.P.R.A. § 857, do not establish an express limitation of recordable real rights, but, on the contrary, they permit the registration of any title or act which, without having a proper name at law, modifies some of the powers of the ownership over real property or real rights. In our positive law prevails the theory of *numerus apertus* which admits the possibility of creating real rights other than those provided by the Civil Code, *Colón* v. *San Patricio Corp., supra* at 252.[21]

---

[19] II *op. cit.* at 476.

[20] I *op. cit.* at 457–58.

[21] On the nature of real right of the servitudes, see Puig Brutau, *op. cit.* at 381, and Manresa, *op. cit.* at 626.

The case law herein established does not belittle the high respect due our Civil Code. The Civil Code is one of our most complete legislative pieces and one of the most valuable elements of our cultural heritage. In order to preserve it, we must interpret it with imagination and in creative form. It is obvious that the social medium in which we live and in which the Civil Code operates is quite different from the farming society of the 800s which produced that Code. Yet, the Code is written in simple and all-embracing language which permits within its margins the development of the case law which revitalizes it and insures its permanence.

Commenting on the terseness of the Code in its treatment of legal servitudes, Manresa says:

"Actually, since it is not possible to incorporate into the Civil Code all express provisions concerning this type of servitudes, the Spanish Code system, with respect to what is not determined therein, is to be preferred."[22]

The brief and general manner in which the Code treats these juridical institutions is fortunate because it permits "maintenance of the necessary equilibrium (not static but dynamic) between the juridical system and its surrounding elements."[23] That flexibility which the Code imparts to many of the institutions comprised therein buttresses rather than weakens it, and makes it possible to survive notwithstanding the radical changes of the social medium in which it operates, since those general provisions are capable of assuming, in the unity of their own significance, an empirically variable content.[24] Only praise is due, according to Castán, to the

---

[22] 4 op. cit. at 735.

[23] See Del Vecchio, *Los Principios Generales del Derecho* 128, Spanish translation by Ossorio Morales (2d ed., Barcelona, 1948).

[24] Del Vecchio, *op. cit.*, *ibid.* A professor of several generations of Puerto Rican lawyers, of pure civil-law tradition, writes: "The work of the jurist must consist in interpreting the texts, without deforming or

wish to conform the juridical institutions to the practical exigencies and purposes which they are bound to serve.[25] If out of respect to the Code the latter were erroneously construed in conceptualistic form, it would soon become obsolete and inoperative. That would mean sentencing it to death, which indeed we do not wish to do.

The lawmaker's discrepancies, writes Puig Brutau, shall only be taken as starting points for creative construction,[26] and adds:

"The Law, in our opinion, only in a subordinate or merely implementary manner should be considered as a logical concatenation of words, expressions, and concepts; in its authentic reality it consists of a repertoire of practical solutions for actual phenomena, for conflicts of interest which stem from social community life."[27]

Even a civil-law authority of traditional approach such as Professor De Castro explains that "the application of the norms presupposes a creative activity in that the interpreter gives meaning, develops and completes the law."[28]

In view of the antimony raised in this case, it is our duty as a Court confronting practical and concrete problems of law and not mere hypotheses or imaginary cases, to create a practical solution which will impart justice in the particular case and which will create the most socially use-

---

subverting them, conforming them to the new needs of life." Guaroa Velázquez, *Las Obligaciones Según el Derecho Puertorriqueño* xiv (Equity Publishing Corp., 1964).

[25] Preface by the said writer to *La Propiedad de Casas Por Pisos*, by Batlle, p. 9 (1933); *Castle Enterprises, Inc.* v. *Registrar*, 87 P.R.R. 738 (1963).

[26] III *Fundamentos de Derecho Civil* 83 (1953).

[27] *Op. cit., ibid.* See, also, for a more extensive and documented treatment of the matter, *La Jurisprudencia Como Fuente del Derecho* 140, 143 and 210; and by Castán, *La Formulación Judicial del Derecho* 18–26 and 143–60 (1954).

[28] I *Derecho Civil de España* 389 (1st ed.); 465 (2d ed.).

ful norm. In other words, it is our duty to create a law of jurists, as termed by the doctrine.

Before concluding, we wish to mention that the case at bar is different from that of *Benet* v. *Registrar*, 65 P.R.R. 460 (1945). In that case the owner of a lot purchased a portion of another adjacent lot and consolidated both lots so as to make a single property. In order to record the segregation and consolidation, the purchaser and the vendor sought the corresponding permit from the Planning Board. In the document of approval the Board made the following warning:

"This Board wishes to inform that the Master Plan for the Major Thoroughfares for the Metropolitan Area of San Juan already adopted by this Board, *includes* a highway called in said document, Express Highway, Southern Portion, *which is planned* along the sections where the lots, the subject matter of this subdivision, are situated. Even though at this time *the drawing showing the precise location of the servitude of right of way needed for said highway has not yet been prepared,* this Board *recommends* that before commencing any construction in the first 26 meters of these lots, that is, between the present military road and the rear of said lots, the surveys or maps be consulted as to this particular."

Based on that warning, the registrar recorded the segregation and consolidation, but set forth the following: "said property was subject to . . . a mention of projects of servitude of right-of-way for a public highway, still in preparation by the Planning Board of Puerto Rico." The purchaser sought the cancellation of that mention of servitude of right-of-way, to which, notwithstanding the registrar's refusal, we consented. There we concluded that a mere recommendation by the Board to consult the studies or plans on proposed highway before erecting any construction on those lots, did not authorize the registrar to set forth in the registration a mention of servitude of right-of-way.

It ought to be clear that that situation bears no resemblance to the case which we decide here. Furthermore, it should be noted that in *Benet, supra,* the owner challenged a mention of servitude made by the registrar without authorization, and in the case at bar the owner seeks the registration of the servitude in order to make the subdivision. In the first case, the interest of the owner was prejudiced without authorization to justify the same, and in the case at bar the owner, for the benefit of his own interest, and the Board, for the benefit of the public interest, seek the registration of the legal servitude, which is proper, as already explained.

For the reasons stated in the foregoing opinion, the registrar's note will be reversed and the entries sought ordered.